## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| PERKINS, INC. | ) | Civil Action No. 3:14-CV-115 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GENERAL MOTORS LLC | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Perkins, Inc. ("Perkins") as and for its Complaint against Defendant, General

Motors LLC ("GM"), asserts and alleges as follows:

### The Parties

1.     Plaintiff, Perkins is a North Dakota corporation with its principal place of business

located at 721 West Main Street, Valley City, North Dakota, and a citizen of North

Dakota.

2.     Perkins, a "Dealer" as defined in N.D.C.C..§51-07-00.1(2), operates a Chevrolet

automobile dealership pursuant to a "Franchise," as defined in N.D.C.C. §51-07-00.1(4)

granted by GM.  Perkins' annual sales total nearly one million dollars $5,000,000.00 and

the market value of the business is millions of dollars.

3.     Defendant, GM, a Delaware limited liability company, located at 100 Renaissance Center

in Detroit, Michigan, does business in the State of North Dakota.  The sole member of

General Motors LLC is General Motors Holdings LLC, whose sole member is General

Motors Company.  Each of these entities was organized and exists under the laws of the

State of Delaware and maintains a principal place of business in the State of Michigan. All of the underlying LLC members are domiciled outside of the State of North Dakota. GM is not a citizen of North Dakota.

4.  GM manufactures, markets, and wholesales Chevrolet automobiles, parts, and accessories to automobile dealerships in North Dakota and the rest of the United States.

5.  GM is a "manufacturer", "distributor", and a "franchisor" as defined in N.D.C.C.§51-07-00.1(8), (3), and (5).

## JURISDICTION

5.  This court has jurisdiction pursuant to 28 U.S.C. §1332(a)(1) in that there is complete diversity of citizenship and, because it concerns a valuable automobile franchise, the amount in controversy exceeds the sum of $75,000 exclusive of attorney's fees and costs.

6.  Venue is proper in this district pursuant to 28 U.S.C.§1391(a) in that jurisdiction is founded solely on the basis of diversity, and GM, by virtue of its systematic and continuous business contacts in this district, resides in this district.

## GENERAL ALLEGATIONS

7.  Perkins operates under a franchise agreement with GM for the Chevrolet line-make. Perkins Sales & Service Agreement (the "Dealer Agreement" or "Franchise"), along with the corresponding Standard Provisions, is attached hereto as "Exhibit A".  The Dealer Agreement authorizes Perkins to sell new Chevrolet products and perform authorized warranty and service work on Chevrolet vehicles.

8.  The Dealer Agreement became effective October 1, 2010 and runs through October 2015 by its own terms.

9.    GM drafted the Dealer Agreement in its entirety.  GM does not entertain any negotiation with dealers over the terms and conditions set forth in the Dealer Agreement.  Perkins has no meaningful bargaining power with GM.  The Dealer Agreement is a contract of adhesion, offered on a "take-it-or-leave-it" basis.  From time to time GM unilaterally issues provisions that purport to amend the Dealer Agreement, including, but not limited to, changes to the Areas of Primary Responsibility ("APR").

10.   The Perkins family has operated a GM franchise (i.e., Oldsmobile and Cadillac) in Valley City since 1977.  Perkins became a Chevrolet dealer in 1987.  The current operator, Jerry Perkins, assumed the position of dealer operator in 1985.

11.   Perkins has endeavored to vigorously and aggressively promote and sell Chevrolet products.  For example, Perkins has engaged in various community marketing activities including but not limited to off-site displays at community events and hosting events at the dealership to showcase new vehicle models.   Indeed, the latest figures reveal Perkins ranks better than several other Chevrolet dealerships in the state in sales performance.

12.   At all times relevant hereto, Perkins has been in compliance with the GM Dealer Agreement.  Prior to 2012, GM had not formally notified Perkins of any failure to comply with the sales performance requirements of the Franchise.

13.   Indeed, GM elected to retain Perkins as a Chevrolet dealer in 2009 following the GM bankruptcy, when it otherwise terminated hundreds of dealerships nationwide, including some in North Dakota and could have terminated Perkins.

14.   At that time, GM approved Perkins operations including its facility and location.  Article 4.4 of the Dealer Agreement Standard Provisions provides that Perkins may only operate

from the "approved location", which is designated in the Dealer Agreement.  GM
approved Perkins' facility when it issued the most recent Dealer Agreement.

15.    Perkins has invested a substantial amount of capital into its Chevrolet franchise through,
*inter alia*, advertising, training, staffing, marketing and general operating expenses.  For
example, Perkins participated in recommended GM training courses *via* the internet and
rented a billboard on the nearby interstate highway to promote the Chevrolet dealership.
Perkins has also invested in the dealership by acquiring and rezoning adjacent lots, which
was part of a plan to expand the dealership and ultimately, provide GM a new facility.

## Sales Performance Measurements

16.    GM's Dealer Agreement is a form contract written by GM with no opportunity for a
dealer to negotiate the terms.  Upon information and belief, all GM dealers in the State of
North Dakota and the United States operate under the same Dealer Agreement standard
provisions as Perkins.

17.    Article 5.1.1 of the Dealer Agreement, entitled "Responsibility to Promote and Sell,"
reads in part: "Dealer agrees to effectively, ethically and lawfully sell and promote the
purchase, lease and use of Products by consumers located in its Area of Primary
Responsibility."  In Article 9, the Dealer Agreement states:

> Satisfactory performance of Dealer's sales obligations under Article 5.1
> requires Dealer to achieve a Retail Sales Index equal or greater than 100.
> If Dealer's Retail Sales Index is less than 100, Dealer's sales performance
> will be rated as provided in the General Motors Sales Evaluation
> process…In addition to the Retail Sales Index, General Motors will
> consider any other relevant factors in deciding whether to proceed under
> the provisions of Article 13.2 to address any failure by Dealer to
> adequately perform its sales responsibilities. General Motors will only
> pursue its rights under Article 13.2 to address any failure by Dealer to
> adequately perform its sales responsibilities if General Motors determines
> that Dealer has materially breached its sales performance obligations
> under this Dealer Agreement.

4

18.   GM does not otherwise define material breach and has not otherwise indicated
      how it determines when a failure to adequately perform its sales responsibilities
      constitutes a material breach of sales performance obligations.

19.   In evaluating Perkins' sales performance, GM chooses to utilize what it calls the Dealer's
      "Retail Sales Index" ("RSI").

20.   According to GM, RSI is based on a comparison of the Dealer's reported retail sales to
      the sales necessary to equal state average market share in Dealer's currently assigned
      Area of Primary Responsibility ("APR").  GM reviews a dealer's RSI to determine
      whether the dealership is performing at, above, or below the average of all dealers in the
      applicable geographic area.

21.   The RSI - Sales Effectiveness formula is inherently unreasonable and unfair in that,
      among other things: (i) it is based on an average which by definition prevents all dealers
      from meeting or exceeding the required sales performance, (ii) it is measured within a
      variable geographic area unfairly defined by the manufacturer and measured after-the-
      fact making the required performance level unknown to the dealer, (iii) it is strongly
      influenced by the supply of vehicles made available to the subject dealer as well as other
      dealers in the geography identified for comparison; and (iv) does not take into account
      the unique nature of the subject dealer's market.

22.   The RSI measurement is unreasonable because, among other things, by definition, it is
      mathematically impossible for every dealer to be at or above average sales penetration.
      Under the formula there will always be dealers above and below the average.  If all
      dealers below the average were eliminated, then a certain percentage of the dealers

previously performing at or above average would suddenly be performing below average and considered to be poor performers, and so on until only one dealer remained.

23.     The RSI measurement is unreasonable because, by the very nature of the Sales Effectiveness formula, the RSI calculation is performed after-the-fact.  Sales are measured by registrations with the State of North Dakota Department of Transportation, which are not determined for a period of sixty (60) to ninety (90) days after the date of sale.  The calculation is a function of the performance of other dealers in the State within the unique circumstances of their individual markets.  The dealer does not know how many new vehicle sales the dealership needs to make to be at 100% RSI until the measurement period is closed and the calculation is made months later.  The RSI "standard" is not known, or knowable, in advance.  As a result, the dealer is held to an unknown and unknowable standard, and so unable to alter the dealership's performance to meet the standard.

24.     The RSI measurement for sales effectiveness is unreasonable because it does not take into account a dealer's unique market circumstances in determining satisfactory performance, including, but not limited to, the demographics of the market, the shopping patterns of the market, the presence or absence of competition in a dealer's market, the differences between rural and urban markets and the amount and type of vehicle models delivered to dealers in the geography selected for comparison.

**Assignment of Dealer's Territory**

25.     The assignment of territory for which a dealership is responsible plays a large part in the sales performance calculation.  The assignment of territory, known as "Area of Primary Responsibility" ("APR"), is intended to match a dealership with the customers in the

market who will find the dealership most convenient in which to shop for a new vehicle and to obtain service for their vehicle. GM purportedly assigns territory using United States census tracts based first upon the closest dealer by driving distance to the geographic center of a census tract and then considering natural barriers and other factors, which may make another dealership a more convenient location in which to shop for a new vehicle and obtain service on a vehicle.

26.  The APR is an area that GM uses to evaluate each dealer's performance and the sales potential in its market, among other things.

27.  GM failed to fairly assign Perkins' APR, resulting in a territory that includes census tracts where individuals reside who would find one or more of Perkins' neighboring Chevrolet dealers more convenient to shop for a new vehicle and obtain service on their vehicle.

28.  Upon information and belief, following, GM's bankruptcy in 2009, GM eliminated a dealer in Lisbon, North Dakota and reassigned substantial portions, if not all, of that dealer's territory to Perkins. These areas are more convenient to dealers in Fargo.

29.  The larger the assigned APR, the greater the total number of vehicle registrations against which a dealer's actual sales are measured and *vice versa*. Thus, GM's failure to properly assign Perkins' APR has caused Perkins' sales performance requirements to be substantially inflated and not reasonably attainable.

30.  GM advised Perkins that its APR had been revised to include the Lisbon territory. Consequently, the APR assigned to Perkins was too large and unfairly impacted the sales performance calculations and periodic sales objectives.

31.   Perkins' newly assigned APR contained improperly assigned census tracts and so
      improperly inflated Perkins' sales performance and sales objective requirements. Upon
      information and belief, some of the territory included in the revised APR was sixty miles
      from the dealership.

32.   GM's failure to apply an appropriate APR renders GM's sales performance measurement
      unreasonable and demonstrates a lack of good cause and good faith.

### Vehicle Allocation and Inventory

33.   GM is the sole source of new vehicle inventory for its dealers.  Dealers, like Perkins, are
      reliant upon GM to allocate and distribute vehicles to it in an amount that will allow the
      Dealer to meet customer demand.

34.   In the Dealer Agreement, GM promises "to distribute new Motor Vehicles among its
      dealers in a fair and equitable manner."  Article 6.1 Standard Provisions.

35.   This is important because Chevrolet dealers do not just compete with Ford and Dodge
      dealers, but they also compete with other Chevrolet dealers.  If a dealer does not have an
      adequate supply of vehicles, it will be at a substantial disadvantage because the customer
      will go to a dealer that has what it is looking for.

36.   GM recognizes exactly that in Article 6.4.1 of the Standard Provisions, which provides
      that:

            Dealer recognizes that customers expect Dealer to have a
            reasonable quantity and variety of current Model Vehicles in
            inventory.  Accordingly, Dealer agrees to purchase and stock and
            General Motors agrees to make available, subject to Article 6.1, a
            mix of models and series of Motor Vehicles identified in the Motor
            Vehicles Addendum in quantities adequate to enable Dealer to
            fulfill its obligations in its Area of Primary Responsibility.

37. The above quoted language reflects that the dealer needs not only a sufficient volume of inventory, but also the proper "model mix" in order to meet customer demand and GM's sales performance requirements. For example, if Dealer A has 100 vehicles on its lot, all of which consist of two door pickup trucks in black and white while Dealer B has 100 vehicles, but roughly 10 of each model in varying colors and trim packages, Dealer B will be much better positioned to meet customer demand and GM's sales requirements.

## Perkins Sales Performance

38. Perkins has drastically increased its sales volume of Chevrolet vehicles as well as its performance under GM's RSI measurement.

39. Perkins Chevrolet car sales volume increased by 220% in 2013 compared to 2012 sales. Likewise, Perkins Chevrolet light duty truck sales volume was over 200% of what it was in 2012.

40. Not surprisingly, Perkins RSI score for 2013was significantly greater than its 2012 RSI score, and Perkins ranked ahead of five other Chevrolet dealers in North Dakota.

41. In the first half of 2014, Perkins sold nearly as many Chevrolet light duty trucks as it did in all of 2012 (i.e., 6/2014 CYTD: 40; 2012 YTD: 44). The same is true for Chevrolet cars (i.e., 6/2014 CYTD: 8; 2012 YTD: 10).

42. Upon information and belief, Perkins has outsold its Ford and Chrysler, Jeep, Dodge, Ram competitors in Valley City, for 2014 year to date.

43. On August 4, 2014, GM notified Perkins by letter (attached hereto as "Exhibit B") ("Notice of Termination" or "NOT") that Perkins had breached its Dealer Agreement based upon its failure to meet its sales obligations, so Perkin's Chevrolet franchise would be terminated on November 14, 2014, pursuant to Article 13.2 of the Dealer Agreement.

44.   Perkins files this action as authorized by N.D.C.C.§51-07.02.1 and N.D.C.C.§51-07.02.3 because the proposed termination is unfair and prohibited as it lacks the requisite good cause, is not taken in good faith, and the grounds relied upon have not been applied in a uniform and consistent manner by GM.  As a result, the proposed termination is prohibited under N.D.C.C. §51-07.02.1 and North Dakota law.

### GM Attempts to Run Perkins Out of Business

44.   Notwithstanding that Perkins has been in compliance with its Dealer Agreement and operated from an approved facility, GM has attempted to run Perkins out of business by failing to provide the vehicle inventory necessary to meet the sales requirements and by retaliating against Perkins for failing to renovate its facility.

### Lack of Inventory

45.   During the pertinent time periods, Perkins has been unable to obtain and stock the inventory necessary for it to meet GM's sales requirements.

46.   The lack of inventory prevented Perkins from meeting the sales requirements as a raw number, but also made Perkins uncompetitive with other Chevrolet dealers that had much greater vehicle inventory.  It is common knowledge in the industry that consumers search the internet for the vehicle type they are looking for and will not even set foot in a dealership if the dealer lacks the selection they desire.  Indeed, as set forth above, GM recognizes such in the Dealer Agreement it drafted.

47.   Lack of desirable inventory at Perkins meant that consumers would shop in other markets, such as Fargo or Jamestown even if Perkins was closer and/or more convenient.

48.   GM attempted to remedy its failure to allocate Perkins enough vehicle inventory in 2013 when it provided Perkins with a one-time supplemental increase in inventory.  On or

around June of 2013, GM provided approximately 87 additional Chevrolet vehicles to Perkins.

49.   At the time, GM told Perkins that this number represented the number of vehicles it would need to sell to reach 100% RSI.  Perkins sold all the vehicles, but GM still claims Perkins failed to meet the 100% RSI figure.

50.   This is an excellent illustration of why GM's sales performance measurement is unreasonable as the number of vehicle sales needed to meet GM's measurement cannot be determined in advance.  The number is only known several months after the fact. Consequently, Perkins could sell all of the vehicles it could reasonably acquire, and yet, still be said to be underperforming.

51.   This also illustrates that GM failed to provide Perkins enough vehicles (and the appropriate mix) so that Perkins could meet GM's sales requirements.  Simply put, without the necessary vehicle inventory, Perkins ability to meet GM's requirements was impossible.

**Facility Demands**

52.   Upon information and belief, GM's Notice of Termination is not solely based upon Perkins' sales performance but instead, is in retaliation for Perkins' refusal to construct a new dealership facility in the timeline desired by GM.

53.   GM operates a facility program entitled Essential Brand Elements ("EBE"), which it desires all GM dealers to participate in.  The EBE program has brand (i.e. Chevrolet, Buick, GMC, and Cadillac) specific requirements for each aspect of the dealer's facility such as the exterior, the interior, signage, etc.  Perkins facility is not EBE compliant, and

GM, through its area personnel, has made repeated reference to its desire that Perkins provide a new facility.

54.    However, Perkins facility was expressly approved by GM in the most recent Dealer Agreement and has not changed nor have the requirements under the Dealer Agreement. Notwithstanding the facility approval, Perkins has acquired several nearby parcels of land so as to allow it to expand its dealership operations and provide GM a new dealership facility.  GM was aware of Perkins actions.  Nonetheless, it was not reasonable for Perkins to build a new facility when GM was threatening to terminate (and ultimately issuing a termination notice) the source of income necessary to maintain the facility.

55.    GM's retaliatory actions with respect to the facility are further reinforced by the fact that there are at least five Chevrolet dealers performing worse than Perkins (according to GM's metrics), but GM is not seeking to terminate those franchises.  GM's actions are not in good faith.

## Notice of Default and Termination

56.    Upon information and belief, GM informed Perkins, by correspondence dated May 29, 2013, that GM believed Perkins to be in violation of its sales performance obligations.

57.    GM provided Perkins with a six month cure period (July – December 2013) during which GM measured Perkins sales performance to determine whether Perkins "cured" the alleged sales issues.  Perkins performance during that period of time improved substantially compared to the prior periods, due in part to the one time vehicle injection. However, GM still failed to provide enough vehicles to allow Perkins to meet the required sales performance.

58.   By correspondence dated August 4, 2014, GM notified Perkins that GM would terminate the Perkins Chevrolet franchise on November 14, 2014.

59.   Pursuant to N.D.C.C.§51-07-02.1(4), upon the filing of this Complaint, Perkins franchise agreement shall remain in full force and effect and Perkins shall retain all rights and remedies pursuant to the terms and conditions of its Chevrolet Dealer Agreement, including, but not limited to, the right to sell or transfer ownership interest, until a final determination by the court of competent jurisdiction of the issues in the action.

60.   Perkins has met all conditions precedent to bringing this action.

## COUNT I - UNLAWFUL TERMINATION

61.   Plaintiff realleges paragraphs 1 - 60 as if fully set forth herein.

62.   Perkins files this protest as authorized by N.D.C.C. §51-07-02.1 and seeks a determination that the proposed termination is unfair and prohibited under North Dakota law.

63.   GM is not acting in good faith and does not have good cause in proposing to terminate Perkins' Franchise in that GM has set Perkins' sales performance requirement at an unreasonable level and/or the performance criteria GM cites as the grounds for the termination have not been applied in a uniform and consistent manner by GM is unreasonable and/or Perkins demonstrated substantial progress towards compliance with the performance criteria during the six month/extended cure period.

64.   GM has not acted in good faith and does not have good cause in proposing a termination of Perkins' Franchise in that the metrics used for measuring sales performance are unfair, unscientific and inappropriate as applied to Perkins.

65. GM has not acted in good faith and does not have good cause in proposing a termination of Perkins' Franchise in that GM has withheld a sufficient supply and mix of vehicles from Perkins.

66. GM has not acted in good faith, because GM's proposed termination is retaliation for Perkins failure to construct a new dealership facility despite Perkins existing facility being approved by GM.

67. GM has not acted in good faith and does not have good cause in proposing a termination of Perkins' Franchise in that the geographic area used by GM to calculate the sales performance of Perkins is inappropriately large, and contains areas more distant from, and less convenient to, Perkins and closer, and more convenient, to longer established competing Chevrolet dealerships.

68. The Dealer Agreement does not permit the proposed termination in that Perkins has complied with the sales obligations as provided for in the Dealer Agreement.

69. GM's proposed termination of Perkins' Franchise is unfair and prohibited in that the proposed termination relies upon an alleged breach of the sales performance requirements of the Dealer Agreement which is not in fact a material and substantial breach considering the faulty application of the sales performance requirement.

70. GM's proposed termination of Perkins' Franchise is unfair and prohibited because GM is utilizing a sales performance standard that is not uniformly and consistently applied by GM.

## COUNT II- VIOLATION OF N.D.C.C. §51-07-02.3(11)

71. Plaintiff realleges paragraphs 1- 70 as if fully set forth herein.

14

72.    GM has attempted to terminate Perkins for a reason other than Perkins failure to comply with the Dealer Agreement.

73.    Specifically, GM is attempting to terminate Perkins because of Perkins failure to provide a new facility that GM desires.

74.    Perkins existing facility is expressly approved under the current Dealer Agreement and Perkins is not under any obligation to make a substantial change and invest potentially millions of dollars into a new facility.  Nonetheless, GM has attempted to terminate Perkins because of its failure to do so.

75.    Section 51-07-2.3(11) makes it an unlawful act for a manufacturer, such as GM, to "attempt or threaten to terminate, cancel, or fail to renew, or substantially change the competitive circumstances of the dealership contracts for any reason other than the failure of the automobile or truck retailer to comply with the terms of the contract between the parties."

76.    GM's actions violate N.D.C.C. §51-07-2.3(11).

## COUNT III – VIOLATION OF N.D.C.C. §51-07-02.3(3)

77.    Plaintiff realleges paragraphs 1- 76 as if fully set forth herein.

78.    Section 51-07-02.3(3) makes it an unlawful act for a manufacturer, such as GM, to "[i]mplement or establish a system of motor vehicle allocation or distribution to one or more of its dealers that is unfair, inequitable, or unreasonably discriminatory."

79.    GM's vehicle allocation and/or distribution system has been unfair, inequitable and/or discriminatory in that it has failed to provide Perkins with enough vehicles to meet its sales obligations and/or customer demand.

80. Further, GM's vehicle allocation and/or distribution system has been unfair, inequitable and/or discriminatory in that it has provided significantly more vehicles as well as a better model mix to competitor North Dakota Chevrolet dealers. This has resulted in those dealers having a more desirable vehicle inventory than Perkins, and resulted in Perkins not making sales it otherwise could have made. GM's vehicle allocation and/or distribution system substantially and negatively impacted Perkins' competitiveness.

81. GM's actions violate N.D.C.C. §51-07-02.3(3).

## COUNT IV - BREACH OF CONTRACT

82. Plaintiff realleges paragraphs 1- 81 as if fully set forth herein.

83. The sale of Chevrolet vehicles is a material condition of the Dealer Agreement.

84. GM asserts that Perkins breached the Dealer Agreement for failure to achieve satisfactory sales.

85. GM is the exclusive distributor of Chevrolet vehicles in the United States. Allocation of Chevrolet vehicles to Perkins is the sole responsibility of, and under the exclusive control of, GM.

86. GM is obligated under the Dealer Agreement to "distribute new Motor Vehicles among its dealers in a fair and equitable manner." (Article 6.1, Standard Provisions)

87. Perkins has regularly and repeatedly sought additional vehicles from GM and elsewhere in order to sell more vehicles. GM has failed or refused to supply such additional requested vehicles to Perkins in the quantities requested and necessary.

88. Had GM provided additional Chevrolet vehicles, Perkins would have retailed additional vehicles.

89.   GM caused any breach for failure to achieve sales by failing to provide an adequate supply of vehicles to Perkins to meet the asserted sales performance requirement.

90.   GM prevented and/or frustrated Perkins' accomplishment of additional Chevrolet sales by failing to render an adequate supply of Chevrolet vehicles.

91.   GM supplied other North Dakota Chevrolet dealers with additional new vehicles as well as a better model mix of vehicles during the times in which GM failed to supply Perkins with additional vehicle allocation.

92.   GM failed to allocate and/or distribute new motor vehicles among its dealers in a fair and equitable manner, and thus, GM's actions violate the Franchise.

93.   GM's actions and inactions caused Perkins to experience lost profits from the sales of new Chevrolet vehicles and related products and services as well as the failure to meet GM's sales performance requirements.

## COUNT V - BREACH OF CONTRACT

94.   Plaintiff realleges paragraphs 1- 93 as if fully set forth herein.

95.   The sale of Chevrolet vehicles is a material condition of the Dealer Agreement.

96.   GM asserts that Perkins breached the Dealer Agreement for failure to achieve satisfactory sales.

97.   GM is the exclusive distributor of Chevrolet vehicles in the United States.  Allocation of Chevrolet vehicles to Perkins is the sole responsibility of, and under the exclusive control of, GM.

98.   Under the Dealer Agreement, "General Motors agrees to make available, subject to Article 6.1, a mix of models and series of Motor Vehicles identified in the Motor

Vehicles Addendum in quantities adequate to enable Dealer to fulfill its obligations in its Area of Primary Responsibility." (Article 6.4.1, Standard Provisions)

99.    Perkins has regularly and repeatedly sought additional vehicles from GM and elsewhere in order to sell more vehicles.  GM has failed or refused to supply such additional requested vehicles to Perkins in the quantities requested and necessary.

100.    Had GM provided additional Chevrolet vehicles, Perkins would have retailed additional vehicles.

101.    GM caused any breach for failure to achieve sales by failing to provide an adequate supply of vehicles to Perkins to meet the asserted sales performance requirement.

102.    GM prevented and/or frustrated Perkins' accomplishment of additional Chevrolet sales by failing to render an adequate supply of Chevrolet vehicles.

103.    GM supplied other North Dakota Chevrolet dealers with additional new vehicles as well as a better model mix of vehicles during the times in which GM failed to supply Perkins with additional vehicle allocation.

104.    GM failed to make available a mix of models and series in such quantities that would have allowed Perkins to meet its sales obligations, and thus, GM's actions violate the Franchise.

105.    GM's actions and inactions caused Perkins to experience lost profits from the sales of new Chevrolet vehicles and related products and services as well as the failure to meet GM's sales performance requirements.

## JURY DEMAND

Perkins demands a trial by jury on all issues and claims triable to a jury.

## PRAYER FOR RELIEF

WHEREFORE Perkins prays for the following relief:

1. A determination that GM's threatened termination violates N.D.C.C.§51-07-02.1 and

   N.D.C.C.§51-07-02.3 and is invalid;

2. A determination that GM's vehicle allocation violates N.D.C.C. 51-07-02.3(3);

3. A determination that GM breached the Dealer Agreement;

4. Damages in an amount to be determined for the aforementioned statutory violations and

   contractual breaches;

5. An order that GM pay the attorneys' fees and costs incurred by Perkins in bringing this

   action, pursuant to N.D.C.C.§51-07.02.1or other law, and

6. Such further relief as this Court deems just and equitable.

Respectfully Submitted,

WOLD JOHNSON, P.C.

Benjamin E. Thomas (ID #04713)
500 2nd Avenue N #400
PO Box 1680 Fargo, ND 58107-1680
Phone: (701) 235-5515
Email: bthomas@woldlaw.com
Attorneys for Plaintiff

JASON T. ALLEN, ESQUIRE
NICHOLAS A. BADER, ESQUIRE
BASS SOX MERCER
2822 Remington Green Circle
Tallahassee, FL 32308
jallen@dealerlawyer.com
nbader@dealerlawyer.com
(850) 878-6404
Attorneys for Plaintiff
Pro Hac Pending